UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

61 EAST MAIN STREET ASSOCIATES, LLC,
MOCHE HALPERN,

                              Plaintiffs,

         - against -

THE VILLAGE OF WASHINGTONVILLE,
THOMAS DEVINKO, in his official and
individual capacity, DONNA JACARUSO, in
her official and individual capacity, SUSAN
WALSKI, in her official and individual capacity,
STEVE PRESSER, in his official and individual
capacity, and VERNON COLEMAN, in his
official and individual capacity,

                              Defendants.
_____

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Civil Action No.  24-cv-2647

       Plaintiffs 61 East Main Street Associates, LLC and Moche Halpern (collectively, "Plaintiffs"), by and through their attorneys, Whiteman Osterman & Hanna LLP, for their Complaint herein, respectfully allege as follows:

## **PRELIMINARY STATEMENT**

       1.      The Fair Housing Act prohibits municipalities from making housing unavailable to anyone based on their religion.

       2.      As New York Attorney General Letitia James has said: "[b]locking the construction of homes to prevent a religious group from living in a community is flat out discriminatory. . .This campaign to deny housing to members of the Jewish community is not only a clear violation of our laws but is antithetical to our basic values and blatantly anti-Semitic. New York has a longstanding commitment to ensure equal housing opportunities for all residents – regardless of race, gender, or religious identity – and we will ensure this commitment is upheld." New York

Attorney General Letitia James, Press Release, Attorney General James Takes Action To Fight Discrimination Against Jewish Community, Dec. 5, 2019, available at https://ag.ny.gov/press-release/2019/attorney-general-james-takes-action-fight-discrimination-against-jewish-community (last accessed June 20, 2022).

3.     The Village of Washingtonville (the "Village"), like other municipalities in Orange County, is engaged in a long-standing campaign to exclude or substantially limit the Orthodox Jewish community from seeking housing in the Village, in violation of the Fair Housing Act.

4.     Orange County and the Village have a significant shortage of available housing that could serve the needs of the Orthodox Jewish community.

5.     Plaintiffs are residential housing developers, who are members of the Orthodox Jewish faith, and sought to develop multi-unit housing in the Village, available to anyone willing to rent them.

6.     Plaintiffs submitted a site plan application to the Town of Washingtonville Planning Board and the Village Board in 2018 regarding their property at 61 East Main Street in the Village.

7.     Plaintiffs have gone through appeals with the Zoning Board of Appeals as well regarding their 61 East Main Street in the Village since at least 2018.

8.     Over the course of the next five years, Plaintiffs jumped through every hoop that the Defendants presented them with, incurring significant expense to answer any questions raised by the Defendants or residents of the Village.

9.     Plaintiffs retained consultants, attorneys, engineers, and other professionals to address any concerns that the Village had.

10.     Over the course of the five years that the Village left Plaintiffs' application pending,

the Village received significant outcry from its residents of an anti-Semitic nature, seeking to prevent Plaintiffs, members of the Orthodox Jewish community, from developing necessary multi-family housing in the Village.

11.     In 2020, the Village brought litigation against Plaintiffs regarding their Property at 61 East Main Street, which resulted in a September 22, 2020 stipulation, entered into by Plaintiffs and Defendants requiring the Planning Board to issue a determination as to the site plan in good faith and in a timely fashion.

12.     On November 21, 2022, the Village held a public hearing regarding a potential moratorium prohibiting land development in the Village for a period of six (6) months. Attached hereto as Exhibit A is a copy of the minutes from the November 21, 2022 public hearing.

13.     At the November 21 hearing, the Village enacted a moratorium on land use approvals in the Village by unanimous vote from the Village Board. Attached here to as Exhibit B is a copy of the moratorium.

14.     The Village then opened the November 21 hearing up to public comment.

15.     Current mayor DeVinko and current deputy mayor Jacaruso were outspoken at this meeting about their desires to prevent any exceptions to the moratorium. Ex. A.

16.     Mr. DeVinko also expressed his desire to prevent any exemptions to the moratorium, even in the face of hardship. *Id.*

17.     Mr. DeVinko further expressed that he thought unless a project already received an affirmative approval, it should be included within the limits of the moratorium. *Id.*

18.     However, this moratorium specifically contained a carve-out allowing the Plaintiffs' project to be evaluated by the Planning Board because it was submitted prior to the moratorium.

19.     As of the moratorium, the Planning Board still had not issued a determination as to the Plaintiffs' site plan application but left the site plan application open to public comment, or more applicable here, public anti-Semitic scrutiny.

20.     During this time, the Planning Board received significant anti-Semitic commentary from the residents of the Village.

21.     Finally, by April 2023, the Village closed public comment with respect to the site plan application.

22.     The Village had 62 days to issue a determination regarding Plaintiffs' site plan application. It did not do so.

23.     Instead, the Village issued another moratorium without a carve out for Plaintiffs' project, thereby putting Plaintiffs' project indefinitely on hold.

24.     The Village caved to the incessant anti-Semitic rhetoric of the residents of the Village and enacted a moratorium to prevent the Plaintiffs' project from gaining any further traction – a project which the Village had previously expressed support for and for which the Village would obtain an increase in tax benefits to further aid services in the community.

25.     The Village caved to its residents' anti-Semitism despite an overwhelmingly obvious need for multi-family, multi-unit housing in the Village, as described by the Village itself, Orange County, and Governor Hochul speaking on behalf of the entire state of New York, which is facing an insurmountable housing crisis.

26.     This is just the latest action by Defendants that has violated Plaintiffs' constitutional rights and violated the precepts of the United States and New York Constitutions barring religious discrimination.

27.     Having no other recourse, Plaintiffs are commencing this litigation against the

Defendants who have excluded multi-family housing and housing that would serve the demonstrated needs of the growing Orthodox Jewish population.

## PARTIES

28.     Plaintiff 61 East Main Street Associates, LLC is a New York limited liability company with a principal place of business located at 61 East Main Street, Washingtonville, New York.

29.     Plaintiff Moche Halpern is a real estate developer, whose principal place of business is 61 East Main Street, Washingtonville, New York. He practices Orthodox Judaism and was targeted by the public and the Village because of his religion.

30.     Defendant Village of Washingtonville is a municipality in Orange County, New York duly organized and lawfully existing under the Laws of the State of New York. The Village's administrative offices are located at 9 Fair Lawn Drive, Washingtonville, New York.

31.     Defendant Thomas DeVinko is being sued in his official capacity as the current mayor of the Village and in his individual capacity.

32.     Defendant Donna Jacaruso is being sued in her official capacity as a current trustee and Deputy Mayor of the Village and in her individual capacity.

33.     Defendant Susan Walski is being sued in her official capacity as a current trustee of the Village and in her individual capacity.

34.     Defendant Steve Presser is being sued in his official capacity as a current trustee of the Village and in his individual capacity.

35.     Defendant Vernon Coleman is being sued in his official capacity as a current trustee of the Village and in his individual capacity.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1331 and 42 U.S.C. § 1441.

37.     Venue is properly laid in this District pursuant to 42 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

**The Project at 61 East Main Street**

38.     Plaintiffs purchased certain real property located at 61 East Main Street in the Village of Washingtonville, located in Orange County, New York (the "Property").

39.     The Property consists of 4.5 acres of land improved with a three-story, approximately 4,887 square foot wood frame residence, and a detached two-story garage.

40.     The remaining portions of the Property are undeveloped.

41.     The Property is currently located in the Village's "O-R" zoning district, which is the "office-residential" district.

42.     Plaintiffs sought to develop 28 multi-unit, multi-family apartment units at the Property, which is located in the Village (the "Project").

43.     Multi-family housing is permitted in the O-R zoning district.

44.     The Project complies with the zoning requirements of the "O-R" zoning district.

45.     Plaintiffs submitted an application to the Planning Board for site plan approval for the Project in or around December 2018.

46.     Since December 2018, the Planning Board has held a significant number of public meetings and accepted public comment, permitting the public to be heard regarding the Project.

47.     Plaintiffs have responded to the questions, comments, and concerns from both the Village and residents of the Village and expended significant sums of money to do so.

48.     In fact, Plaintiffs have revised their site plans *at least* twice since 2018 to

accommodate concerns of the Village and its residents.

49.     The Project would be a significant improvement to the lack of available housing in the Village.

50.     The Project would also provide multi-family, multi-unit housing to members of the Orthodox Jewish faith who otherwise are excluded and have been historically excluded from the Village.

**Defendants Stipulated to Review the Site Plan Application Diligently and in Good Faith**

51.     The Village brought litigation against Plaintiffs in State Court in 2020 seeking to limit how Plaintiffs could use the Property. *See Village of Washingtonville v. 61 East Main Street Associates, LLC, Efraim Smilowitz, and Abraham Smilowitz*, Index No. EF02965-2020 (Sup. Ct. Orange Cty).

52.     As a result of that litigation, on or about September 22, 2020, Plaintiffs and Defendants entered into a Stipulation of Settlement, attached here as Exhibit C.

53.     The Stipulation of Settlement provided:

> [Plaintiffs], ha[ve] heretofore made an application to the Village of Washingtonville Planning Board (the "Planning Board") for the approval of a site plan. That application was amended and an amended site plan (the "Site Plan") was filed on or before July 15, 2020, for the development of the Premises allegedly in accordance with the O-R Zoning District in which the Premises is located. The approval sought by such application is or shall be caused to be in compliance with the provisions of the Village of Washingtonville Code unless specifically otherwise authorized by the Village. The structures and improvements to be constructed and/or utilized under such approval| shall all be constructed and/or utilized in accordance with all applicable Village Code provisions, including, but not limited to, all provisions regarding the Office Residential (O-R) District and all applicable building and fire and safety codes, rules and regulations. *The Village shall review the application for the Site Plan to a conclusion, diligently and in good faith*. (emphasis added).

*See* Exhibit C.

54.     The Stipulation of Settlement, which was executed by counsel for the Village and the Village Building Inspector, acknowledges the Village's receipt of Plaintiffs' site plan application for the Project.

55.     Upon information and belief, the Planning Board then began review of the Plaintiffs' site plan application, as required by the Stipulation of Settlement.

56.     After the Stipulation of Settlement, Plaintiffs continued to follow all of the rules and requirements imposed by the Village for getting their Project off of the ground.

57.     On or about March 11, 2021, the Planning Board held a public meeting where 61 East Main Street was discussed. Attached hereto as Exhibit D is a copy of the March 11, 2021 Planning Board meeting minutes.

58.     At the March 11 meeting, the engineer for Plaintiffs represented the following information:

> We have two (2) residential multi-family buildings. Each one is approximately 7,000 square feet area. On the plans you will see open space green area, we are providing it in the front. We will work with the Department of Transportation with regard to establishing a right-of-way when we get to that point in the project. Each individual multi-family building has 14 residential units, which are a mix of about 2- and 3-bedroom units. If you take a look at what is required for parking, it is about two spaces per dwelling per unit, so we have 56 spaces shown. The site lays out fine as it relates to parking, handicap access, obviously there will be more work that is needed for preparation plans. There were two major concerns when we left here from the last meeting, one of which was reviewing the multiple dwelling versus dwelling situation. Looking at the substitution that is permitted in the code, it can be an office or commercial on the first floor with residential. The next issue we needed to take a look at was multiple buildings. We would be looking for a variance for additional residential units on the first floor as a trade-off substitution from commercial area, which would change from 14 units to 28 units. We are looking for the ability to have two buildings as opposed to one building. We are here for the Planning Board to review the plan to see if there is anything that you would like to comment on and after that we would request a recommendation

from the Board to approach the Zoning Board of Appeals for those
particular variances.

Exhibit D at p. 3.

59.     The Building Inspector raised the issue as to whether or not more than one building

is permitted on the Property.

60.     The Building Inspector also raised the issue whether under the existing zoning

ordinances, whether more than one commercial tenant would be permissible.

61.     Upon information and belief, the Building Inspector wrote an opinion letter

indicating that he feels that under the existing zoning ordinance, Plaintiffs could only have one

building on the premises and that Plaintiffs could only have one commercial tenant.

62.     Plaintiffs appealed the Building Inspector's opinion to the Village Zoning Board of

Appeals.

63.     Plaintiffs met with former Mayor Joseph Bucco and the Building Inspector to

discuss a proposed resolution.

64.     There was a consensus with Plaintiffs, former mayor Bucco, and the Building

Inspector that Plaintiffs should make an application to the Zoning Board of Appeals to not only

challenge the Building Inspector's determination and ask for variances, but to change their site

plan to consist of two buildings for solely residential use.

65.     At this time, the Planning Board voted unanimously to refer the matter to the

Village Zoning Board of Appeals.

66.     On or about May 6, 2021, the Village Zoning Board of Appeals announced that

there would be a subsequent meeting on June 17, 2021 to discuss the Village Building Inspector's

determination with respect to 61 East Main Street. Attached hereto as Exhibit E is a copy of the

May 6, 2021 ZBA meeting minutes.

67.     On or about June 17, 2021, the Village Zoning Board of Appeals held a public meeting to discuss 61 East Main Street and to determine whether the zoning code permits more than one building on the Property. Attached hereto as Exhibit F is a copy of the June 17, 2021 ZBA meeting minutes.

68.     The ZBA found that the zoning code permitted the construction of two buildings on the Property.

69.     On or about November 9, 2021, the Planning Board held another public meeting. Attached hereto as Exhibit G is a copy of the November 9, 2021 meeting minutes.

70.     At the November 9, 2021 Planning Board meeting, it was recommended that Plaintiffs change their proposal from a commercial and residential proposal to a strictly residential proposal.

71.     At the November 9, 2021 Planning Board meeting, the Planning Board voted to designate the Planning Board as the lead agency for this Project.

72.     On or about February 17, 2022, the Village Zoning Board of Appeals held another public meeting. Attached hereto as Exhibit H is a copy of the February 17, 2022 ZBA meeting minutes.

73.     At the February 17, 2022 meeting, Plaintiffs sought to receive approval for an area variance to allow 28 residential units instead of the prior plan consisting of 14 residential units and a commercial space at the Property, after the Village strongly suggested Plaintiffs do so.

74.     Plaintiffs received a positive response from the Village Zoning Board of Appeals:

> Zoning Board of Appeals Member Denni Lozza adds that she likes the look of it especially from the street side, all residential is better than having it chopped up.
>
> Zoning Board of Appeals Member Jim Kiernan adds that he likes it more than the original plan.

> Chairperson Maureen DeVinko adds that keeping it at residential
> will reduce traffic rather than if you had the mixed use.

Exhibit H at 2.

75.     Plaintiffs' engineer further addressed concerns about traffic and water drainage. Ex.

H at 2.

76.     The Village Zoning Board of Appeals then referred the matter for the March 2022

meeting for a determination.

77.     The Village Zoning Board of Appeals held a public meeting on March 31, 2022 to

discuss the area variances that Plaintiffs sought for the Project. Attached hereto as Exhibit I is a

copy of the March 31, 2022 ZBA meeting minutes.

78.     At the March 31, 2022 Village Zoning Board of Appeals meeting, Chairwoman

Maureen DeVinko indicated the need in the Village for housing. Ex. I.

79.     Residents of the Village expressed concerns about traffic and parking, among other

things, which Plaintiffs' engineer promptly and thoroughly addressed. Ex. I.

80.     The Planning Board held a public meeting on May 10, 2022 to consider Plaintiffs'

site plan. Attached hereto as Exhibit J is a copy of the May 10, 2022 Planning Board meeting

minutes.

81.     Plaintiffs' engineer and traffic consultant were in attendance at this meeting to

answer any additional questions and provide as much detail as possible to quash any concerns

about Plaintiffs' Project.

82.     At this meeting, for the first time, the Village Engineer imposed a requirement on

Plaintiffs to conduct a study with respect to the presence or absence of bats at the Property. Ex. J.

83.     At this time, the Planning Board voted in favor of referring the plan to the Orange

County Department of Planning. Ex. J at 3.

84.     The Planning Board also set the date for yet another public hearing regarding the Property in June 2022.

85.     The Planning Board held another public meeting on June 14, 2022 to hear public comment with respect to the Project. Attached hereto as Exhibit K is a copy of the June 14, 2022 Planning Board meeting minutes.

86.     Plaintiffs' engineer and traffic consultant appeared at the June 14, 2022 meeting to answer any questions the public or the Planning Board may have had.

87.     Planning Board member Bob Buchalski moved to have Plaintiffs' Project referred to the Washingtonville Central School District School Bus Department.

88.     The Planning Board voted in favor of referring Plaintiffs' Project to the Washingtonville Central School District School Bus Department, further delaying a decision.

89.     The Planning Board left the public hearing open and scheduled a new date to continue to hear residents' concerns.

90.     The Planning Board held another public hearing on August 9, 2022 to hear public comment with respect to the Project. Attached hereto as Exhibit L is a copy of the August 9, 2022 Planning Board meeting minutes.

91.     Current mayor Devinko had appeared at this meeting, before he was mayor, and inquired as to Plaintiffs' flood plan and flood insurance.

92.     Several residents again raised issues of traffic, but Plaintiffs' traffic consultant ensured the Village residents that their traffic study was currently under evaluation by the New York State Department of Transportation.

93.     Interestingly, the Village Engineer represented that the Planning Board *could not* create new laws just to regulate Plaintiffs and their Project.

94.     The Planning Board again adjourned the public hearing with respect to Plaintiffs' site plan and left public comment open.

95.     At the September 27, 2022 Planning Board meeting, the Planning Board voted in favor of postponing the next public hearing regarding 61 East Main Street.

96.     The Planning Board held another meeting on November 22, 2022 regarding 61 East Main Street and made clear that public comment remained open. Attached hereto as Exhibit M is a copy of the November 22, 2022 Planning Board meeting minutes.

97.     At this time, the Planning Board attorney said that the Planning Board was required to wait another 30 days for the Orange County Planning Department to make a determination regarding the Project.

98.     In or around November 2022, the Village proposed a local law that would adopt a six (6) month moratorium on land use approvals in the Village, which could be extended for two additional six (6) month periods (the "Moratorium").

99.     The Moratorium contained an exemption from the moratorium for any project for which the Village Planning Board had received an application on or before October 31, 2022.

100.    Plaintiffs submitted their application to the Planning Board on or before July 15, 2020, and therefore would be exempt from the moratorium.

101.    Further, the Planning Board was required to comply with the Stipulation of Settlement to review Plaintiffs' site plan application "to a conclusion, diligently and in good faith" yet it failed to do so.

102.    The Planning Board held yet another public meeting to discuss 61 East Main Street on January 24, 2023. Attached hereto as Exhibit N is a copy of the Planning Board meeting minutes from January 24, 2023.

103.    Plaintiffs sent three of their consultants, including their engineers, to provide even more information to the public and the Planning Board than they already have over the last four prior years.

104.    At the January 24 meeting, Plaintiffs' engineer specifically addressed the three most prevalent comments from the public:

> the applicant and its team reviewed all of the public comments that have been received so far and determined that traffic, flooding and storm water comments were the 3 most prevalent comments from the last public hearing meetings. The applicant and team reviewed photos, that were submitted by the public, from Hurricanes Irene/Sandy showing the flood waters on and around the property. The proposed buildings will be approx. 6.3' above flood elevation and are designed to handle 100 year flood elevation.

Ex. N.

105.    Plaintiffs' traffic consultant fielded inquiries about the traffic study and proposed resolutions:

> A detailed traffic study has been prepared. The 2021 traffic study was updated to provide additional information upon request by the Planning Board. The Department of Transportation (DOT) is requiring the applicant to do some off site mitigation to install video detection systems (1 at the Brotherhood Plaza/Route 94 intersection and 2 at the intersection of State Routes 94 and 208) at the applicant's expense. Chairman Buchalski asked about the crosswalk at the project site to which Mr. Grealy responded that the DOT is requiring the applicant to redo the crosswalk by adding a Rapid Flashing Beacon (RRFB), re-stripe the crosswalk and fix the ADA ramps/entry points. Member Wiley asked Mr. Grealy to be sure that the Planning Board has received all DOT correspondence to the applicant.

Ex. N.

106.    Plaintiffs and their consultants patiently fielded dozens of repetitive questions and comments that have been answered, *ad nauseum*, throughout an extended public comment period.

107.    Yet again, the Planning Board left the public comment period open through the next Planning Board meeting.

108.    The Planning Board again reopened public comment regarding 61 East Main Street on February 14, 2023. Attached hereto as Exhibit O is a copy of the February 14, 2023 Planning Board meeting minutes.

109.    At the February 14, 2023, Plaintiffs and their consultants endured even more questioning and provided even more explanation of the same information it had already provided, as well as additional information that the Planning Board and Village residents continued to ask of Plaintiffs.

110.    And again, the Planning Board adjourned the February 14, 2023 meeting leaving the public comment period still open.

111.    In or about March 2023, the Village government underwent a complete overhaul.

112.    Former mayor Bucco lost in the mayoral election to current mayor Thomas DeVinko.

113.    Former trustees Calore and Kolar were not reelected, and instead current trustees Jacaruso and Walski were elected to their positions.

114.    On or about April 3, 2023, former trustees Sampson and Laudato resigned.

115.    Shortly thereafter, the Village Board appointed current trustees Coleman and Presser.

116.    Upon information and belief, DeVinko, Jacaruso, Walski, Coleman, and Presser are openly anti-development and insistent on ensuring that Plaintiffs' Project never moves forward.

117.    On or about April 25, 2023, the Planning Board held a public meeting to hear comments from the members of the Village regarding the Project. Attached hereto as Exhibit P is a copy of the minutes from the April 25, 2023 Planning Board meeting.

118.    At this meeting, Michael Morgante, Plaintiffs' engineer for the Project, addressed several questions raised by the Village, its members, and the Planning Board. Ex. P at 26-29.

119.    Plaintiffs' traffic consultant also appeared at the April 25, 2023 meeting to address any concerns. *See e.g.*, Ex. P at 32-40.

120.    The Planning Board Chairman made the following comments at the April 25, 2023 meeting:

> I'm just giving you an explanation. A lot of eyes have looked at this and a lot of legal eyes before yours. This project is just going on and on and on. This public hearing has been open since last June. We've had numerous meetings talking about flooding, talking about traffic and mitigation as to what is going to happen. We've gotten the DOT involved. We've gotten the reports back from the police. We've gotten reports back from the fire, from EMS, et cetera. So they've all weighed in on this project at this point. The applicant has literally said yes to Orange County Department of Planning, yes to the police recommendations, yes to the fire recommendations, yes to extra parking that we mandated that was above and beyond. They have said no to nothing. So anybody else who looks at this, what are they actually going to say to these people? We want more what? They haven't said no to anything. I really find it difficult to not make a determination this evening.

Ex. P at 89-90.

121.    Chairman Buchalski repeatedly made statements that the Planning Board had gone through the issues and concerns with respect to the Project "like seven times already" acknowledging that it was time to end public comment. Ex. P at 70.

122.    After such comments, the Planning Board elected to close the public hearing and move towards taking action on SEQRA at the next meeting, which demonstrates that the Planning

Board and its consultants are fully satisfied with the Project and the Plaintiffs' response to comments.

123.   The Planning Board then had 62 days to make a determination.

124.   Rather than permit the Planning Board to comply with the obligations under the Stipulation of Settlement and the Village Law and reach a final decision on Plaintiffs' site plan application after two-and-a-half (2.5) years of review, the Village, in obvious bad faith, on May 15, 2023 adopted a new moratorium law (the "New Moratorium") that removes the previous exemption for Plaintiffs' site plan application and prohibits the Planning Board from making a final decision.

125.   A copy of the New Moratorium is attached hereto as Exhibit Q.

126.   Notably, the New Moratorium was one of the first actions Defendants DeVinko, Jacaruso, and Walski took in their anti-development agenda.

127.   Defendants Presser and Coleman abstained from voting on the New Moratorium.

128.   The New Moratorium was revised to include the Project in direct contravention of the Stipulation and Settlement, where a prior version had exempted the Project.

129.   The timing of the revised Moratorium to apply to the Project seems to be directly correlated with the Planning Board's intent to move forward on the Project without any other rationale.

130.   Plaintiffs' site plan application is one of few applications, if not the only application, that is affected by the New Moratorium, and, thus, it is abundantly clear that the Board has purposefully chosen to target Plaintiffs' site plan application and forbid the Planning Board from completing its duties under the Stipulation of Settlement and the Village Law.

131.    The intent of the New Moratorium is vague and unclear and does not identify an emergent or crisis condition that the Village is seeking to cure by stopping all development, particularly with respect to development by the Orthodox Jewish community, which is required for the basis of a moratorium.

132.    Instead, the stated intent of the New Moratorium is:

> The Village Board hereby finds that many economic and social impacts and trends have changed since the Village's last review of its Comprehensive Plan more than two decades ago. Furthermore, it is likely that as a result of any updates to the Plan, zoning code amendments may need to be enacted. In order to allow sufficient time to review and update the Plan and enact any corresponding zoning amendments, the Village Board hereby finds that there is a critical and compelling need, in the public interest as set forth herein, to impose a Moratorium on the review and approval of Land Use Approvals in the Village.

Ex. Q at Section 3.

133.    There is no indication in the New Moratorium what purported "economic and social impacts and trends" the Village is referring to.

134.    The Village mentions only vague development concerns.

135.    It is wholly unclear why the Village enacted the New Moratorium.

136.    It is apparent from these actions that the Village and the Planning Board are seeking to exclude members of the Orthodox Jewish community from the Village.

137.    As a direct result of the Planning Board's action, three (3) members of the Planning Board have resigned their positions, leaving the Planning Board without sufficient membership to take action on Plaintiffs' site plan application, as is required.

**Members of the Village Frequently Made Their Anti-Semitism Known to the Village at Village Board and Planning Board Meetings**

138.    Because the Village and Planning Board kept the public comment period open during the five years review has been pending with the Planning Board, residents of the Village have had five years to share their anti-Semitism with the Village and Planning Board.

139.    From at least 2021 through 2023, the Members of the Village have repeatedly expressed anti-Semitic rhetoric with respect to Plaintiffs and their Project as a reason to try and prevent Plaintiffs from developing the Project.

140.    Members of the Village took to Facebook to express their overwhelming anti-Semitism calling on the Village Board and Planning Board to prevent Plaintiffs from developing housing in the Village.

141.    For example, a Facebook user Maureen DeVinko wrote "PLEASE PLEASE PLEASE Village of Washingtonville 10992 RESIDENTS REGISTER TO SPEAK AT THE 6pm MEETING TONIGHT, OUR HOMES AND BUSINESSES WILL BE UNDER WATER IF A DEVELOPMENT OF THIS PROPORTION IS ALLOWED TO TAKE PLACE. PLEASE DO NOT FORGET HOW HURRICANE IRENE AFFECTED OUR LIVES AND HOMES!!!!" Attached hereto as Exhibit R is a copy of Ms. DeVinko's Facebook post.

142.    Upon information and belief, Maureen DeVinko is the wife of the Village's current mayor Thomas DeVinko.

143.    Additionally, upon information and belief, Defendant Donna Jacaruso is the administrator of a Facebook group titled "It Takes a Village – 10992." Attached hereto as Exhibit S, which contains copies of certain posts from It Takes a Village – 10992.

144.    Upon information and belief, It Takes a Village – 10992 was created to encourage residents of the Village to protest to the Village, Planning Board, and Zoning Board of Appeals to prevent Plaintiffs from developing their Property.

145.    Ms. Jacaruso repeatedly posts in It Takes a Village – 10992 under the guise of clearing up "misinformation." Ex. S at 16.

146.    In reality, Ms. Jacaruso's posts in It Takes a Village – 10992 contain great detail of the significant efforts she has undertaken to harass Plaintiffs, including by contacting every agency or entity in the Village and even Orange County in an attempt to convince them to block Plaintiffs' Project. Ex. S at 16.

147.    For example, Ms. Jacaruso detailed her efforts to ensure that Plaintiffs could not obtain a demolition permit from the Village Building Department. Ex. S at 16.

148.    Ms. Jacaruso also represented to the followers of It Takes a Village – 10992 that she is "giving it all [she] has" to fight against Plaintiffs and their development. Ex. S at 3.

149.    Ms. Jacaruso made it clear to her followers in It Takes a Village – 10992 that she retained legal counsel to fight against Plaintiffs and that she is closely tracking the steps that Plaintiffs were required to take, including through the Planning Board and Zoning Board of Appeals. Ex. S at 4.

150.    Upon information and belief, Ms. Jacaruso set up a GoFundMe page to obtain donations for her legal fight against Plaintiffs.

151.    Ms. Jacaruso, now, after apparently using It Takes a Village – 10992 to gain political clout, is conveniently the Trustee of the Village.

152.    The administrators of It Takes a Village – 10992 even went so far as to hold a meeting for members of the Facebook group to discuss their grievances with Plaintiffs. Ex. S at 5.

153.    Thomas DeVinko, the Village Mayor, is also a frequent author in It Takes a Village – 10992. Ex. S at 1.

154.    For example, Mr. DeVinko posted in the group that it was his goal to "preserve" the Village from "high density development." Ex. S at 1.

155.    Mr. DeVinko similarly posted that he intends to keep the Village a "quaint and historic community." Ex. S at 1.

156.    Mr. DeVinko similarly repeats his desire and intention to "PRESERVE OUR VILLAGE." Ex. S at 1.

157.    It appears that Mr. DeVinko's comments are propaganda geared towards preserving the Village as a homogenous society that does not welcome outsiders of different walks of life, including Plaintiffs and similarly situated members of the Orthodox Jewish faith.

158.    On or around May 3, 2021, an individual, upon information and belief, named Emily Santoro, operating her Facebook account under the name "Emily Martha" shared a post from an organization "CUPON Orange" encouraging residents of the Village to attend a Zoning Board of Appeals meeting with respect to the Project. Attached hereto as Exhibit T is a copy of Ms. Santoro's Facebook May 2021 Facebook post.

159.    Ms. Santoro then wrote "TWENTY-EIGHT APARTMENTS in two buildings on MAIN STREET. What would this do to small town Washingtonville. [sic]. And to tear down, what should be a historical home, is a CRIME. This will be the start of some VERY obvious and UNPLEASANT changes in town." Ex. T.

160.    In or around April 2022, on Facebook, CUPON Orange continued encouraging its members and the residents of the Village to attend the Planning Board meetings in an attempt to

protest Plaintiffs and their Project. Attached hereto as Exhibit U is a copy of the CUPON Orange Facebook posts.

161.    An individual named Matthew Coneen responded to CUPON Orange's Facebook post and stated "[t]his shit piss me off [sic] this town are [sic] catering to the Hasidic's [sic]." Ex. U.

162.    Clare Kilcarr Frey commented on this Facebook post from CUPON Orange and stated "[m]ore crap heading our way!!!" Ex. U.

163.    An individual named Josephine Sanginiti-Coneen replied "Yea! Let's turn this town into another Kyrius [sic] Joel!" Ex. U.

164.    On or around June 14, 2022, Ms. Santoro again shared a post from CUPON Orange on Facebook and adding the commentary: "ARE YOUR EYES OPEN NOW!?!?!?!???? Ya'll [sic] have LOST YOUR MINDS if you don't SHOW UP to these meetings. Allowing homes to get town down [sic] for MONSTROSITIES like this is disgusting…I am at a loss for words for what Washingtonville has allowed to happen." Attached hereto as Exhibit V is a copy of Ms. Santoro's Facebook post.

165.    An individual named Tom Prodromides replied "[A]nd let it fill up with Hasidic families." Ex. V.

166.    Another individual "Jeremy Justin" commented "South blooming grove [sic] tried to stop this… eventually they became community members and all that matters is the votes! The majority vote will soon flip to an unfavorable option!" Ex. V.

167.    Another individual, Cathy Neuwirth Davidson made a Facebook post on or around June 20, 2022 expressing her purported concerns with flooding at the Property. Attached hereto as Exhibit W is a copy of Ms. Davidson's Facebook post.

168.    Ms. Davidson encouraged residents of the Village to attend meetings to express their fears and concerns. Ex. W.

169.    Ms. Davidson's post included a photograph of 61 East Main Street with clear flooding around the entire property. Ex. W.

170.    An individual named Thomas Berhman replied "[w]ill be better this way [sic] Hasidic family's [sic] have a place to swim" with three emoticons expressing crying from laughing. Ex. W.

171.    Mr. Berhman also included a "GIF" moving image of what appears to be hundreds of members of the Orthodox Jewish community running. Ex. W.

172.    In a Facebook post made on or around August 9, 2022, a woman named Julie Betz shared a poster asking members of the Village to "preserve the integrity of our Village" and say "HELL NO!" to the Project at 61 East Main Street. Attached hereto as Exhibit X is a copy of the Julie Betz Facebook post.

173.    Other users wrote comments on Ms. Betz' post demonstrating their anti-Semitism and animus towards Plaintiffs and their Project and to convince Village residents to go to Village and Planning Board meetings to convince the Village and Planning Board to deny Plaintiffs' right to develop their Project.  Ex. X.

174.    For example, a user named John Finnigan wrote "[n]ext, there will be polio in the Waste Water in town." Ex. X.

175.    Another user named Patrick Ketcham commented "[h]ere they come" clearly referring to the Orthodox Jewish community. Ex. X.

176.    In another series of Facebook exchanges, individuals named Tom Lyons, Sean Thornton, and others engaged in anti-Semitic rhetoric to encourage residents of the Village to try

and discourage the Village and Planning Board from allowing Plaintiffs' Project to go forward. Attached hereto as Exhibit Y is a copy of the Facebook posts between Mr. Lyons and Mr. Thornton.

177.   Mr. Lyons specifically wrote "[n]eed as many Village residents as possible to go to these meetings. Your homes are at stake. Can't let this become another Monroe." Ex. Y.

178.   Upon information and belief, Monroe, New York also has many residents belonging to the Orthodox Jewish faith.

179.   Mr. Thornton replied to Mr. Lyons and stated "I think it may be too late." Ex. Y.

180.   Mr. Lyons then wrote "NOT yet." Ex. Y (emphasis in original).

181.   An individual named Anthony Sgourdas replied to Mr. Lyons and Mr. Thornton and stated "Tell the Hasids to go back to KJ .. they are not welcomed in our town.. they have taken and destroyed enough of our state already." Ex. Y.

182.   Upon information and belief, Mr. Sgourdas' reference to "Hasids" means the Hasidic Jewish community and "KJ" refers to Kiryas Joel, a predominantly Orthodox Jewish community.

183.   In another post from on or around August 9, 2022, an individual named Dawn Gallagher Salka shared a news article to Facebook titled "Proposed Apartment Building Draws Criticism in Washingtonville" and cites to Plaintiffs' Project at 61 East Main Street. Attached hereto as Exhibit Z is Ms. Salka's post.

184.   Ms. Salka appears to have made the post on Facebook to encourage Village residents to speak out against Plaintiffs' and their Project.

24

185.    Other individuals, such as Clare Kilcarr Frey, again here, commented on Ms. Gallagher's post encouraging Village residents to attend meetings to speak out against the Project. Ex. Z.

186.    An individual named Bob Young commented and said "I think everyone should arrive heated and ready for confrontation…is it our 'friends' building this?" Ex. Z.

187.    In response, Ms. Frey replied "of course." Ex. Z.

188.    Mr. Young then replied with a picture of three gentlemen in traditional religious garb, clearly of the Orthodox Jewish faith. Ex. Z.

189.    An individual named "Mo Buzz" then replied "Please come out and have your voices heard. We don't Washingtonville [sic] to become just like [S]pring [V]alley, Monsey and now what [sic] starting to happen in South Blooming Grove!" Ex. Z.

190.    Upon information and belief, Mr. Buzz was referring to three municipalities in Orange County with large Orthodox Jewish communities.

191.    On or around January 24, 2023, Ms. Jacaruso urged residents of the Village to appear on Tuesday January 24 for a public hearing with respect to Plaintiffs and their Project. Attached hereto as Exhibit AA are copies of Ms. Jacaruso's Facebook posts.

192.    Ms. Jacaruso, however, made clear by posting in all capital letters and bold writing that only those individuals who oppose Plaintiffs' project should attend. Ex. AA.

193.    Mr. DeVinko replied to Ms. Jacaruso's posts indicating that the Village Board ignored Plaintiffs and predicted that the Plaintiffs would make a future hardship application as a result of the Village's actions. Ex. AA.

194.    Mr. DeVinko urged residents to beware of this situation. *Id.*

195.     Then, at the April 25, 2023 meeting, a resident of the Village expressed his fear that the Village would become like "Palm Tree." Ex. AA at 45.

196.     Palm Tree is a town in Orange County coterminous with the Village of Kiryas Joel, with a predominantly Orthodox Jewish population.

197.     Members of the Village have made it painstakingly clear to the Village and Planning Board that they do not want Plaintiffs to develop the Property into multi-family, multi-unit apartments out of a "fear" that members of the Orthodox Jewish community would occupy those apartments.

**The Village Historically Has Excluded the Orthodox Jewish Community by Failing to Provide Adequate Housing in the Village**

198.     The Village of Washingtonville released a comprehensive plan for 2023 (the "Village Comprehensive Plan"). Attached hereto as Exhibit BB is a copy of the Village's Comprehensive Plan.

199.     The Village Comprehensive Plan identifies that 68% of the Village's tax parcels are single family homes. Ex. BB at 23.

200.     By contrast, two-family, three-family, mobile homes, apartments, mixed-use residential, and multi-family residential properties, all collectively make up about 20% of the Village's tax parcels. Ex. BB at 23.

201.     Multi-family residential properties and apartments are only two of six categories that make up 20% of the Village's tax parcels, meaning the number of just multi-family residential properties and apartments are far less than 20% of the Village's tax parcels. Ex. BB at 23.

202.     In fact, only 0.05% of the Village's tax parcels are apartments. Ex. BB at 24.

203.     Not only does the Village know of the dire need for multi-family housing in the Village, but Orange County has also made this clear in its Comprehensive Plan. Attached hereto

as Exhibit CC is the Orange County Comprehensive Plan.

**Governor Hochul Mandated that Municipalities, much like Washingtonville, to Increase Development to Address the Housing Crisis in New York**

204.    On or around January 10, 2023, Governor Hochul issued a mandate that the State of New York desperately needed more housing to address a clear housing crisis. Attached hereto as Exhibit DD is a copy of Governor Hochul's mandate.

205.    Governor Hochul's mandate called for the building of at least 800,000 new homes immediately. *Id.*

206.    Governor Hochul advised: "New York faces a housing crisis that requires bold actions and an all-hands-on-deck approach. . .Every community in New York must do their part to encourage housing growth to move our State forward and keep our economy strong. The New York Housing Compact is a comprehensive plan to spur the changes needed to create more housing, meet rising demand, and make our state a more equitable, stable, and affordable place to live." *Id.*

207.    Governor Hochul's mandate also requires "**Downstate municipalities** served by the Metropolitan Transportation Authority **where the housing need is most acute**, including New York City, will have a three percent new homes target over three years." *Id.* (emphasis supplied).

208.    Upon information and belief, the Village is located directly between two Metropolitan Transportation Authority train stations, Salisbury Mills, which is about a 5 minute drive from Washingtonville to the East, and Campbell Hall, which is about a 10 minute drive from Washingtonville to the West. *Id.*

209.    The Village is therefore one of the municipalities that is most acutely in need of adequate housing. *Id.*

210.    Governor Hochul also mandated that municipalities need to tailor their strategies to

increase the housing supply, including through offering new incentives towards multifamily buildings, much like Plaintiffs' Project. *Id.*

211.    Governor Hochul clearly indicated that downstate municipalities within commuting distance of New York City desperately need "local rezoning or higher density multifamily development." *Id.*

212.    Further, Governor Hochul mandated that any multifamily housing project located and proposed in a municipality that fails to adhere to this mandate may take advantage of a "fast-track housing approval process" if the locality fails to permit the project. *Id.*

213.    A project will only be denied if the locality can demonstrate "a valid health or safety reason for denying the application." *Id.*

214.    As identified in the New Moratorium, the Village has failed to articulate any reason for the New Moratorium with any sufficient level of detail, let alone a "valid health or safety reason."

215.    The overall purpose of Governor Hochul's mandate is to "remove barriers to housing production," something that the Village is instead erroneously erecting.

216.    It is apparent that the Village and Planning Board have taken action in direct response to the overwhelming anti-Semitic rhetoric spread among the Village and publicly disseminated.

217.    The Village and Planning Board has intentionally delayed issuing a determination and preventing Plaintiffs from proceeding with their Project with the intention of excluding the Orthodox Jewish community from the Village.

218.    As a result, the Village is liable for its exclusionary and discriminatory zoning determination.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Fair Housing Act**
**42 U.S.C. § 3604**

219.    Plaintiffs repeat and reallege each and all of the foregoing allegations set forth in this Complaint with the same force and effect as if set forth herein.

220.    The Village is aware of the need for multi-family housing and has provided evidence that multi-family housing is lacking in the Village. Ex. BB.

221.    Orange County is aware of the need for multi-family housing and has indicated this in its Comprehensive Plan. Ex. CC.

222.    Governor Hochul has mandated municipalities in and around New York City, among other locations, has an acute housing crisis and mandated municipalities do everything in their power to permit development of multi-family housing. Ex. DD.

223.    Defendants, by their bad faith refusal to make a determination of the Plaintiffs' site plan application, which prevents Plaintiffs from developing multi-unit, multi-family apartments, have intentionally discriminated against Plaintiffs by making housing unavailable within the Village on the basis of religion in violation of 42 U.S.C. § 3604.

224.    Plaintiff Moche Halpern practices Orthodox Judaism, and the Village targeted him and this Project for discrimination on the basis of his religion by adopting the residents' anti-Semitic intention to keep housing out of the Village that could be occupied by Orthodox Jewish families like in Kiryas Joel and South Blooming Grove.

225.    By their bad faith refusal to make a determination of the Plaintiffs' site plan application, and by preventing Plaintiffs from developing much-needed multi-unit, multi-family housing in the Village, the Defendants have precluded Orthodox Jewish individuals from moving into the Village by virtue of preventing construction and completion of Plaintiffs' project.

226.    Since the site plan would be necessary to develop multi-unit, multi-family housing in the Village, the Village has effectively kept Orthodox Jewish residents out of the Village for an indefinite period of time by refusing to allow this Project to move forward.

227.    The Defendants' bad faith refusal to make a determination of the Plaintiffs' site plan application is openly discriminatory against Orthodox Jewish citizens on the basis of their religion because Plaintiffs' Project cannot go forward without site plan approval from the Planning Board, which means there cannot be the development of adequate housing by Plaintiffs that meets Orthodox Jewish citizens' necessary religious requirements, including but not limited to Kosher kitchens and livable square footage large enough to accommodate Orthodox Jewish families.

228.    The evidence demonstrating the Defendants' commitment to act on behalf of anti-Semitic constituents to bar Orthodox Jewish individuals and families from building or moving into the Village shows discrimination on the basis of religion within the Village.

229.    Despite the Village's desperate need for multi-family housing, Orange County's well-documented need for multi-family housing, and Governor Hochul's mandate to municipalities such as the Village to increase multi-family housing, the Village bowed to the demands of anti-Semitic constituents.

230.    The Village's bad faith refusal to make a determination of the Plaintiffs' site plan application prohibits Plaintiffs to develop multi-family housing in the Village.

231.    The Village's enactment of the Moratorium and New Moratorium were done in bad faith to prevent Plaintiffs from developing multi-family housing in the Village.

232.    The overwhelming animus towards Orthodox Jewish individuals and families has resulted in the disparate treatment of Orthodox Jews and Plaintiffs by all Defendants.

233.    Plaintiffs are aggrieved persons as defined in the Fair Housing Act, 42 U.S.C.

§ 3602(i)(1) and have suffered harm, damage, and injury as a result of Defendants' conduct.

234.    Plaintiffs have no adequate remedy at law for such harm, damage, and injury caused by Defendants' conduct.

235.    Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights, along with reasonable attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
**U.S. Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**

236.    Plaintiffs repeat and reallege each and all of the foregoing allegations set forth in this Complaint with the same force and effect as if set forth herein.

237.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

238.    The Defendants arbitrarily refused to make a determination of the Plaintiffs' site plan application for over five years, including by enacting the Moratorium and New Moratorium to avoid issuing a determination as to the Project and keeping Plaintiffs, their Property, their Project, and this development in limbo for the past five years and foreseeable future.

239.    The Defendants' actions were designed to prevent development of Plaintiffs' housing project in the Village, which would have made available new housing available to all, to prevent Orthodox Jewish families from moving to, or relocating to the Village and freely practicing their religion.

240.    The Defendants have taken these actions based on their discriminatory animus targeted at Moche Halpern and other members of the Orthodox Jewish community.

241.    The Defendants' intentionally dilatory actions to deny Plaintiffs' review of their site plan application for the Project have prevented Plaintiffs from developing their housing project and caused them substantial monetary damages.

242.    The Defendants' intentionally dilatory actions to deny Plaintiffs' review of their site plan application for the Project were based on anti-Semitic political pressures from constituents, which deprived Plaintiffs of their right to equal protection of the laws.

243.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

244.    Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights, along with reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION
### U.S. Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983

245.    Plaintiffs repeat and reallege all of the foregoing allegations set forth in this Complaint with the same force and effect as though set forth at length herein.

246.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deprive any person of life, liberty or property, without due process of law."

247.    The Defendants arbitrarily refused to make a determination of the Plaintiffs' site plan application for over five years, including by enacting the Moratorium and New Moratorium to avoid issuing a determination as to the Project and keeping Plaintiffs, their Property, their Project, and this development in limbo for the past five years and foreseeable future, and without consideration of the demonstrated need for multi-family housing in the Village, as shown in the

Housing Assessment.

248.    The Defendants' actions and inactions were designed to prevent completion of Plaintiffs' housing project in the Village to prevent the Orthodox Jewish community from moving to or relocating to the Village and freely practicing their religion.

249.    The Defendants have taken these actions based on their discriminatory animus targeted at Moche Halpern and other Orthodox Jews.

250.    The actions of the Defendants have caused Plaintiffs to suffer reputational damage.

251.    Plaintiffs have expended significant sums of money as a result of Defendants' conduct.

252.    Plaintiffs have spent over $994,000 to pay out an investor who dropped out of the Project as a result of Defendants' bad faith conduct.

253.    Plaintiffs have spent over $170,000 up front for the costs associated with the purchase of the Property.

254.    Plaintiffs have spent over $126,000 in taxes relating to the Project.

255.    Plaintiffs have spent over $124,000 in legal fees, engineering fees, planning fees, and other consultant fees relating to this Project as delayed extensively by Defendants' bad faith conduct.

256.    Plaintiffs have spent over $8,600 for application fees to the Village and for consultants to answer five years' worth of questions and comments from the Village and its residents.

257.    Plaintiffs spent no less than $1.5 million to move forward with the Project based on the prior agreements with the Village and lost that $60,758 as a result of the Defendants' unconstitutional actions.

258.    Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights, along with reasonable attorneys' fees.

### AS AND FOR A FOURTH CAUSE OF ACTION
**U.S. Constitution, Fourteenth Amendment**
**42 U.S.C. § 1985(3)**

259.    Plaintiffs repeat and reallege each and all of the foregoing allegations set forth in this Complaint with the same force and effect as if set forth herein.

260.    By way of their conduct as set forth in this Complaint, and acting under color of state law, the Defendants have conspired, and continue to conspire with the residents of the Village to deprive Plaintiffs and others similarly situated of the equal protection and due process of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution, on the basis of their religious beliefs and practices and acts to facilitate the availability of housing the Village that could be occupied by the Orthodox Jewish community.

261.    The Defendants have engaged in a concerted effort and scheme, in collaboration with the residents of the Village to engage in a pervasive and wide-ranging scheme to keep the Orthodox Jewish community out of the Village.

262.    The Defendants have used their zoning laws and actions to deprive Plaintiffs of equal protection and due process of the law and have taken actions against Mr. Halpern and the other members of the Orthodox Jewish religion, including but not limited to the arbitrary refusal to make a determination of the Plaintiffs' site plan application for over five years, including by enacting the Moratorium and New Moratorium to avoid issuing a determination as to the Project and keeping Plaintiffs, their Property, their Project, and this development in limbo for the past five years and foreseeable future, which effectively barred Plaintiffs' multi-unit, multi-family

development.

263.    Together, Defendants seek to disenfranchise and prevent the construction of projects, such as Plaintiffs', that could make housing available to the Orthodox Jewish community in the Village.

264.    The Defendants plainly have taken action against Plaintiffs—Jewish-owned developers—as a result of their positions within the community, and at the direction of or upon the influence the anti-Semitic Village constituents.

265.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury as set forth in detail above.

266.    Accordingly, Plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial against Defendants for the harm and damage caused by Defendants' violation of Plaintiffs' constitutional rights, along with reasonable attorneys' fees.

**WHEREFORE**, Plaintiffs respectfully request that this Court: (1) award Plaintiffs damages in an amount to be determined at trial against all Defendants for Defendants' violation of Plaintiffs' constitutional rights and rights under the Fair Housing Act; (2) award Plaintiffs their reasonable attorneys' fees, costs, and expenses of this and all related litigation; and (3) grant an award of such other and further relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. Pro. 38, Plaintiffs demand a jury trial on all issues so triable.

Dated: April 8, 2024                    WHITEMAN OSTERMAN & HANNA LLP

By:    _____
       Robert S. Rosborough IV, Esq.
       Jennifer Thomas Yetto, Esq.
       *Attorneys for Plaintiffs*
       One Commerce Plaza
       Albany, New York 12260
       518.487.7600
       rrosborough@woh.com
       jyetto@woh.com