UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

61 EAST MAIN STREET ASSOCIATES, LLC, *and* MOCHE HALPERN,

                *Plaintiffs*,

    v.

THE VILLAGE OF WASHINGTONVILLE, THOMAS DEVINKO, *in his official and individual capacities*, DONNA JACARUSO, *in her official and individual capacities*, SUSAN WALSKI, *in her official and individual capacities*, STEVE PRESSER, *in his official and individual capacities, and* VERNON COLEMAN, *in his official and individual capacities*,

                *Defendants*.

No. 24-CV-2647 (KMK)

ORDER & OPINION

---

Appearances:

Jennifer Marie Yetto, Esq.
Robert Stevenson Rosborough, Esq.
Whiteman Osterman & Hanna LLP
Albany, NY
*Counsel for Plaintiffs*

Leo Dorfman, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

    61 East Main Street Associates, LLC, ("61 EMSA") and Moche Halpern ("Halpern") (together, "Plaintiffs") bring this Action against the Village of Washingtonville (the "Village" or "Washingtonville"), Thomas DeVinko ("DeVinko"), Donna Jacaruso ("Jacaruso"), Susan Walski ("Walski"), Steve Presser ("Presser"), and Vernon Coleman ("Coleman") (collectively,

"Defendants"), asserting claims under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 12101, et seq., and 42 U.S.C §§ 1983 and 1985. (*See generally* Am. Compl. (Dkt. No. 38).) Before the Court is Defendants' Motion to Dismiss (the "Motion"). For the reasons discussed below, Defendants' Motion is granted.

I. Background

A. Factual Background

The following facts are drawn from Plaintiffs' Amended Complaint and from materials of which the Court may take judicial notice, including those attached to the Amended Complaint, and are taken as true for the purposes of resolving the instant Motions. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

Halpern is an Orthodox Jewish real estate developer who "operates" 61 EMSA, which is a New York LLC that owns real property at 61 East Main Street, Washingtonville, New York (the "Property"). (Am. Compl. ¶¶ 50–51; Am. Compl. Ex. R (Dkt. No. 38-18) at ECF 2 (a variance request that notes that 61 EMSA owns the Property); Pls' Mem. in Opp. ("Pls' Opp.") (Dkt. No. 48) 15 (noting that Halpern "operates [61 EMSA]").) At an unspecified time, Plaintiffs purchased the Property, which comprises 4.5 acres across two tax parcels and contains a residence, commercial space, and detached two-story garage. (Am. Compl. ¶¶ 60–61, 207.) The Property is zoned in Washingtonville's "office-residential" district ("O-R Zoning"), which permits multi-family housing. (*Id.* ¶¶ 63, 65.) Moodna Creek is located on the Property, part of which is designated wetlands. (*Id.* ¶¶ 192, 207.)

In 2018, Plaintiffs submitted an application to the local Planning Board for approval of a 14-unit apartment building that would replace the existing structures (the "Project"). (*Id.* ¶¶ 67,

99.) On June 24, 2020, Washingtonville brought suit against 61 EMSA, Efraim Smilowitz, and Abraham Smilowitz, alleging that the Property was being used as a boarding house in contravention of O-R Zoning and without a valid Certificate of Occupancy and seeking to order all occupants to vacate the Property. (*See* Petition, *Village of Washingtonville v. 61 E. Main St. Assocs., LLC*, No. EF002965-2020 (N.Y. Sup. Ct. June 24, 2020).) On September 22, 2020, 61 EMSA and Washingtonville entered into a stipulation of settlement in which it was agreed that the Property would be used solely as a two-family residence. (Am. Compl., Ex. C (Dkt. No. 38-3) at ECF 4.) The stipulation noted that "[61 EMSA] has heretofore made an application to the . . . Planning Board . . . for approval of a site plan" that was amended around July 15, 2020, and that Washingtonville "shall review the application for the Site Plan to a conclusion, diligently and in good faith." (*Id.* at ECF 8–9.)

At a March 11, 2021, Planning Board meeting, 61 EMSA representatives made a presentation about the Project, which then included two buildings with 14 residential units and one commercial tenant each. (Am. Compl., Ex. D (Dkt. No. 38-4) at ECF 2–3.) The Building Inspector issued an opinion that the Property could have only one building and one commercial tenant. (Am. Comp. ¶ 87.) The matter was referred to the Zoning Board of Appeals ("ZBA"). (*Id.* ¶ 88; Am. Compl., Ex. D at ECF 5.)

On June 17, 2021, the ZBA held a public hearing to discuss the Project and determine whether O-R Zoning permitted two buildings on the Property. (*See* Am. Compl., Ex. F (Dkt. No. 38-6).) The ZBA determined that O-R Zoning permitted the construction of two buildings on the Property. (Am. Compl. ¶ 94.)

At a November 9, 2021, Planning Board meeting, 61 EMSA representatives noted that 61 EMSA wanted to double the number of residential units at the Property, from fourteen to twenty-

eight in each building, and remove the commercial units. (Am. Compl., Ex. G (Dkt. No. 38-7) at ECF 2.) The Planning Board designated itself as the lead agency for the Project. (*Id.*; Am. Compl. ¶ 97.)

At a February 17, 2022, ZBA meeting, 61 EMSA requested a variance to allow twenty-eight residential units instead of fourteen. (Am. Compl., Ex. H (Dkt. No. 38-8) at ECF 2–3; Am. Compl. ¶ 99.) Members of the ZBA reacted positively. (*See* Am. Compl. ¶ 100.)

On March 31, 2022, the ZBA held a public hearing to discuss the Project. (*See* Am. Compl., Ex. I (Dkt. No. 38-9).) A 61 EMSA engineer discussed the Project's traffic impact and noted that "[s]ome of the building and parking [lot] is located within the actual human flood zone, a very small amount" and that the Project "will not impact floodwaters within the Village of Washingtonville, as it relates to the construction of this site." (*Id.* at ECF 3.) Members of the public "express[ed] concerns about traffic and parking." (Am. Compl. ¶ 105.)

At a May 10, 2022, Planning Board meeting, 61 EMSA representatives discussed the Project and the Board voted to refer the Project to the Orange County Department of Planning. (*Id.* ¶¶ 106–07, 109; Am. Compl., Ex. J (Dkt. No. 38-10).)

On June 14, 2022, the Planning Board held a public hearing to discuss the Project. (Am. Compl. ¶ 111; Am. Compl., Ex. K (Dkt. No. 38-11).) A 61 EMSA engineer noted remaining work on the Project, including a wetlands investigation and "architectural study." (Am. Compl., Ex. K at ECF 3.) The Planning Board voted to refer the Project to the Washingtonville School District Bus Department to review the related Bus Plan. (*Id.*)

On April 9, 2022, the Planning Board held a public hearing to discuss the Project, at which Defendant DeVinko, prior to becoming mayor, inquired as to the Project's flood plan and insurance. (Am. Compl. ¶¶ 116–17; Am. Compl., Ex. L (Dkt. No. 38-12).) Members of the

public "again raised issues of traffic," to which a 61 EMSA representative responded that the Project's traffic study was under evaluation by the New York State Department of Taxation. (Am. Compl. ¶ 118.)

The Planning Board held a meeting on September 27, 2022, when it postponed discussion of the Project until a November 22, 2022, meeting, at which a Planning Board attorney said that the Board had to wait 30 days for the Orange County Planning Department to make a determination regarding the Project and at which the Board kept the public comment period open and adjourned further discussion until January 24, 2023. (*Id.* ¶¶ 121–23; Am. Compl., Ex. M (Dkt. No. 38-13) at ECF 5.)

In or around November 2022, Washingtonville adopted a local law that imposed a moratorium on building construction (the "First Moratorium"). (Am. Compl. ¶ 124.) The stated intent of the First Moratorium was:

> The purpose of this local law is to temporarily suspend land development, construction of buildings and structures, and changes in the use of residential property while the Village considers changes to its comprehensive plan and considers and adopts amendments to its land use regulations. This interim measure is intended to preserve the status quo pending the adoption of an amended comprehensive plan and amended planning and zoning regulations in accordance with the new comprehensive plan. The overall purpose of this local law is to promote community planning values by regulating land development and land use based on a carefully considered plan. This local law prevents a "race of diligence" by those seeking to obtain approvals before the new comprehensive plan and regulations are in place. This local law will protect the public interest and welfare until an amended comprehensive plan and zoning law are adopted.

(Am. Compl., Ex. B (First Moratorium) (Dkt. No. 38-2) § 1.). The First Moratorium provides that "if a complete application for . . . development approval was submitted to the Planning Board prior to the date of adoption of this law, the applicant may request review of the application, but such review shall be for [State Environmental Quality Review Act ("SEQRA")] purposes only." (First Moratorium § 3.D.)

At a January 24, 2023, Planning Board meeting, 61 EMSA representatives noted that most public comments concerned traffic, flooding, and storm water issues. (Am. Compl. ¶ 130; Am. Compl., Ex. N (Dkt. No. 38-14) at ECF 3.) Members of the public made comments on those issues. (Am. Compl., Ex. N at ECF 5–6.) The Planning Board held another meeting on February 14, 2023, at which it discussed the same issues. (Am. Compl. ¶¶ 134–35; Am. Compl., Ex. O (Dkt. No. 38-15).)

In March 2023, DeVinko was elected mayor, Jacaruso and Walksi were elected trustees, and Coleman and Presser were appointed trustees. (Am. Compl. ¶¶ 138–41.)

On April 25, 2023, the Planning Board held a meeting. (*Id.* ¶ 143; Am. Compl., Ex. P (Dkt. No. 38-16).) Stephen Honan ("Honan"), the Planning Board Attorney, noted that he was "new to the Board and new to the review of [the Project]" and had learned that Washingtonville "ha[d] taken steps to retain a professional planner." (Am. Compl, Ex. P at 61:25–62:10.) Honan recommended that the Board "adjourn the public hearing, keep it open until such time" as the planner "would be onboard to review [the Project] and give [the Board] any feedback that might be necessary for the Board's consideration." (*Id.* at 62:11–18.) An attorney for 61 EMSA stated:

> As you well know, [the Project] has been before the Board for eight, nine, ten months now. Public hearings have been open since last fall. Every question that the applicant has been asked has been answered, including the issues about the flooding area, the Moodna Creek, the height of the buildings, and all of the traffic issues have been, over and over again, answered. . . . It's time to close the public hearing and move [the Project] forward. . . . We'd ask that the Board do that tonight.

(*Id.* at 69:2–70:7.) The Board voted to close public hearing but allow written and video comments for a further one week. (*Id.* at 93:4–14.)

On May 15, 2023, Washingtonville adopted a new law (the "Second Moratorium") that was designed to go into effect upon the expiration of the First Moratorium. (Am. Compl., Ex. Q

6

(Second Moratorium) (Dkt. No. 38-17) § 6.A.)  DeVinko, Jacaruso, and Walski voted for the Second Moratorium, while Presser and Coleman abstained.  (Am. Compl. ¶¶ 156–57.)  The stated intent of the Second Moratorium was:

> The Village Board hereby finds that many economic and social impacts and trends have changed since the Village's last review of its Comprehensive Plan more than two decades ago.  Furthermore, it is likely that as a result of any updates to the Plan, zoning code amendments may need to be enacted.  In order to allow sufficient time to review and update the Plan and enact any corresponding zoning amendments, the Village Board hereby finds that there is a critical and compelling need, in the public interest as set forth herein, to impose a Moratorium on the review and approval of Land Use Approvals in the Village.
> The Village Board previously commenced the process of:  (i) retaining the services of a planning and consulting firm; and (ii) creating a Plan Committee to provide guidance and recommendations regarding updating the Plan, and to amend all required provisions in the Village Code and related land use regulations in a manner that is consistent with the most appropriate Plan, as may be amended, to encourage lawful, smart, and sustainable development in the Village.
> Pursuant to the statutory powers vested in the Village to regulate and control land use and to protect the health, safety and welfare of its residents, the Village Board of the Village of Washingtonville hereby finds that an extension of the moratorium is necessary to fulfill the purpose and intent of the local law enacting a moratorium, and hereby amends and extends the previously enacted moratorium for an additional six-month period on the submission and processing of any applications of Land Use Approvals for all development within the Village pending the Village Board's completion and adoption of an update to the Comprehensive Plan and applicable zoning regulations.

(Second Moratorium § 3.)  The Second Moratorium provides that property owners may be granted a variance from the Second Moratorium if they can make a showing of "unnecessary and extraordinary hardship."  (*Id.* § 7.A.)  Unnecessary or extraordinary hardship "shall require establishing severe financial hardship and a showing that the applicant cannot achieve any reasonable return on the property in question as a result of the [Second Moratorium]."  (*Id.*)  Hardship does not include "mere concern that regulations may be changed or adopted," "mere delay in being permitted to make an application or waiting for a decision on the application for a variance, special permit, site plan, subdivision, or other permit during the period of the moratorium" or "financial impacts that may result from the applicant's desired project being

7

potentially precluded by zoning changes and requiring development of a project of lesser value." (*Id.* § 7.B.)  The Second Moratorium could "be extended for up to six (6) months by the Village Board upon a finding that such an extension is necessary to fulfill the purpose and intent of [the Second Moratorium]."  (*Id.* § 6.B.)  The Second Moratorium was extended first in November 2023 and again in May 2024.  (Am. Compl. ¶¶ 171–72.)  On January 26, 2024, 61 EMSA submitted an application seeking a variance.  (*Id.* ¶ 179.)  On May 13, 2024, the Village Board denied the application.  (*Id.* ¶ 195; *see also* Am. Compl., Ex. V ("Variance Denial") (Dkt. No. 38-23).)

Plaintiffs allege that from 2021 through 2023, Washingtonville residents "have repeatedly expressed anti-Semitic rhetoric with respect to Plaintiffs and the[] Project as a reason to try and prevent Plaintiffs from developing the Project."  (*Id.* ¶ 212.)  Plaintiffs append screenshots of individuals commenting on the Project on Facebook.  (*See* Am. Compl., Exs. W–FF (Dkt. Nos. 35-24 to -33).)

On August 22, 2024, 61 EMSA filed an Article 78 petition in Orange County Supreme Court.  Petition, *61 E. Main St. Assocs., LLC v. Village of Washingtonville*, No. EF007025-2024 (N.Y. Sup. Ct. Aug. 22, 2024).  On May 20, 2025, the court granted defendants' motion to dismiss in its entirety.  Decision, *61 E. Main St. Assocs., LLC v. Village of Washingtonville*, No. EF007025-2024 (N.Y. Sup. Ct. Aug. 22, 2024).

B.  Procedural Background

Plaintiffs initiated this Action on April 8, 2024.  (*See* Compl. (Dkt. No. 1).)  On September 17, 2024, Plaintiffs filed the instant Amended Complaint.  (*See* Am. Compl.)  On November 7, 2024, the Court set a briefing schedule.  (*See* Dkt. No. 42.)  On December 18, 2024, Defendants filed the instant Motion.  (*See* Not. of Mot. (Dkt. No. 43); Def's Mem. in

Supp. ("Defs' Mem.") (Dkt. No. 45).)  On January 31, 2025, Plaintiffs filed their Opposition. (*See* Pls' Opp.)  On March 14, 2025, Defendants filed their Reply.  (*See* Defs' Reply Mem. in Supp.  ("Defs' Reply") (Dkt. No. 54).)

## II.  Discussion

### A.  Standard of Review

"[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court sua sponte.  If subject matter jurisdiction is lacking, the action must be dismissed." *PharmacyChecker.com LLC v. Nat'l Ass'n of Boards of Pharmacy*, No. 19-CV-7577, 2024 WL 1199500, at *2 (S.D.N.Y. Mar. 20, 2024) (quoting *Biener v. Credit Control Servs., Inc.*, No. 21-CV-2809, 2023 WL 2504733, at *3 (S.D.N.Y. Mar. 14, 2023) (alteration in original)); *see also Wells Fargo Bank v. 5615 N. LLC*, No. 20-CV-2048, 2022 WL 15523689, at *3 (S.D.N.Y. Oct. 27, 2022) (applying the same standard) (citing *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000)).  "A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks and citations omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (citation omitted)).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d

Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.*; *see Contec, LLC v. Commc'ns Test Design, Inc.*, No. 18-CV-1172, 2019 WL 4736455, at *1 n.1 (N.D.N.Y. Sept. 27, 2019) ("[W]hen a question of the [d]istrict [c]ourt's jurisdiction is raised . . . the court may inquire, by affidavits or otherwise, into the facts as they exist." (quoting *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 401 (2d Cir. 2003))).

B.  Analysis

Plaintiffs bring an FHA discrimination claim, an Equal Protection claim, a Fourteenth Amendment due process claim, and a conspiracy to interfere with civil rights claim. Defendants argue that Plaintiffs do not have third-party standing and that the first three claims are unripe.

1.  Standing

Defendants argue that Plaintiffs lack standing because they seek to challenge the Second Moratorium "on behalf of the Orthodox Jewish community." (Defs' Mem. 19.) Plaintiffs respond that they are "asserting their own rights . . ., which have been violated by the Village's discriminatory actions to block development of Plaintiffs' property." (Pls' Opp. 12.) It appears that Defendants challenge Plaintiffs' standing with respect to their Equal Protection, due process, and conspiracy claims, but not with respect to their FHA claim. (*See* Defs' Reply. 6–7 (referencing, with respect to their standing argument, the Fourteenth Amendment and the Section 1983 and 1985 claims).)

A review of the Amended Complaint indicates that the main premise behind Plaintiffs' asserted causes of action is that Defendants' adverse actions against Plaintiffs were motivated by a discriminatory animus against "the Orthodox Jewish community." (Am. Compl. ¶ 3; *see also id.* ¶ 166 ("[T]he Village and the Planning Board are seeking to follow through on the Village

officials' campaign promises to prevent Plaintiffs' from constructing the Project, and to exclude members of the Orthodox Jewish community from the Village."); *id.* ¶ 290 ("The Village and Planning Board has [sic] intentionally delayed issuing a determination and preventing Plaintiffs from proceeding with their Project with the intention of excluding the Orthodox Jewish community from the Village."); *id.* ¶ 299 ("[T]he Village has effectively kept Orthodox Jewish residents out of the Village for an indefinite period of time by refusing to allow the Project to move forward.").)

In the normal course, "a plaintiff may not rest his claims to vindicate the constitutional or statutory rights of third parties." *Highview Props. D.H.F. Inc. v. Town of Monroe*, 606 F. Supp. 3d 5, 19 (S.D.N.Y. 2022) (citing, inter alia, *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984)). Accordingly, the Supreme Court has "narrowly limited the circumstances in which one party will be given standing to assert the legal rights of another." *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 80 (1978). A plaintiff may assert third-party standing where they can show the (1) third party has been injured, *see Highview Props.*, 606 F. Supp. at 20 (citing *Powers v. Ohio*, 499, U.S. 400, 410–11 (1991), "[(2)] a close relationship to the injured party and [(3)] a barrier to the injured party's ability to assert its own interests," *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 41 (2d Cir. 2015)).

As an initial matter, the Amended Complaint fails to identify members of the Orthodox Jewish community on whose behalf Plaintiffs sue and, therefore, does not plausibly allege that these unidentified members have been injured. Even if Plaintiffs had identified these third parties and plausibly alleged their injuries, Plaintiffs do not allege a "close relationship" such that Plaintiffs will effectively represent their interests. Halpern may pursue claims on his own

11

behalf, but the fact that he is himself Orthodox Jewish does not suffice on its own to establish that he has a close relationship with unidentified members of the Orthodox Jewish community who have been injured. *Cf. Caractor v. City of N.Y. Dep't of Homeless Servs.*, No. 11-CV-2990, 2013 WL 2922436, at *3 (S.D.N.Y. June 14, 2013) ("Although [the plaintiff] is entitled to assert his own claims, he may not raise his church's claims unless the requirements of third[-]party standing are satisfied."); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 594 (S.D.N.Y. 2013) ("[C]ourts historically have permitted '[t]rustees [to] bring suits to benefit their trusts; guardians ad litem [to] bring suits to benefit their wards; receivers [to] bring suit to benefit their receiverships; assignees in bankruptcy [to] bring suit to benefit bankrupt estates; [and] executors [to] bring suit to benefit testator estates.'" (alterations in original) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008))), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019). Plaintiffs do not assert that 61 EMSA is an entity that is Orthodox Jewish, to the extent an entity can be so classified. And Plaintiffs have not alleged that 61 EMSA "is a membership organization, [so they] cannot assert (and, indeed, [have] not asserted) associational standing." *Id.* To the extent Plaintiffs are alleging that members of the Orthodox Jewish community could potentially purchase units in the Project, "such [an] allegation would still be insufficient because parties may not premise third-party standing 'on relationships with hypothetical future clients.'" *Highview Props.*, 606 F. Supp. 3d at 20 (quoting *Fenstermaker v. Obama*, 354 F. App'x 452, 455 (2d Cir. 2009)). Finally, even if Plaintiffs had established all the elements discussed above, they do not allege that these third parties face some barrier that inhibits their ability to assert their own rights. *See BMG Monroe I, LLC v. Village of Monroe*, No. 20-CV-1357, 2022 WL 1094538, at *9 (S.D.N.Y. Apr. 12, 2022)

(concluding that the plaintiff property developer did not establish third-party standing to represent the Hasidic Jewish community at large, in part because the plaintiff did not allege that "these third parties from the Hasidic Jewish community whom it seeks to assert their rights are 'hindered in their ability to protect their own interests'"), *aff'd*, 93 F.4th 595 (2d Cir. 2024). Accordingly, Plaintiffs may not assert their claims in an attempt to vindicate the constitutional or statutory rights of third-party Orthodox Jews.

  2. Ripeness

Defendants argue that, because neither the Planning Board nor the ZBA "ever issued a final determination on the Plaintiffs' site plan application," their FHA, due process, and equal protection claims are not ripe. (*See* Defs' Mem. 9–10.) Plaintiffs argue that "the Village's conduct for over five years has made clear that any efforts made by Plaintiffs are futile because the Village has set out to prevent Plaintiffs from obtaining a determination for their Project" and "has made clear that no final decision will ever come." (Pl's Opp. 9–10.)

"Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 293 (2d Cir. 2022) (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)). The doctrine is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).

13

"Land-use controversies, despite their ability to generate federal suits . . ., are 'matters of local concern more aptly suited for local resolution,' and 'federal courts should not become zoning boards of appeal.'" *Vill. Green*, 43 F.4th at 293 (quoting first *Murphy*, 402 F.3d at 348, then *Harlen Assocs. v. Inc. Vill.*, 273 F.3d 494, 505 (2d Cir. 2001)). "Accordingly, federal courts adhere to 'specific ripeness requirements applicable to land use disputes.'" *Id.* (quoting *Murphy*, 402 F.3d at 347). In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court required the land developer to obtain a final, definitive position as to the application of the relevant zoning laws to the property from the municipal entity responsible for those laws. *Id.* at 186. Under *Williamson County*, a plaintiff cannot seek federal court review of a zoning ordinance or provision until it has submitted at least one meaningful application for a variance. *Id.* at 190; *see also Murphy*, 402 F.3d at 348 (same).[1] Although this ripeness paradigm was originally developed by the Supreme Court in the context of a regulatory takings challenge, *see Williamson County*, 473 U.S. at 186, the Second Circuit has extended the finality requirement to land use disputes involving more than just takings claims, including "zoning challenges based on substantive due process" and "First Amendment rights of assembly and free exercise," among others. *Vill. Green*, 43 F.4th at 294 (citations and quotation marks omitted). Plaintiffs' FHA, due process, and equal protection claims "plainly must satisfy finality." *Id.* (citations omitted).

---

[1] *Williamson County* separately required that a land developer "seek compensation through the procedures the State has provided for doing so." 473 U.S. at 194. The Supreme Court overturned this state law remedies requirement in *Knick v. Township of Scott*, 588 U.S. 180 (2019). However, *Knick* did not disturb *Williamson County*'s final decision requirement. *See id.* at 188 ("Knick does not question the validity of this finality requirement, which is not at issue here."); *see also Sagaponack Realty, LLC v. Village of Sagaponack*, 778 F. App'x 63, 64 (2d Cir. 2019) (summary order) ("*Knick* leaves undisturbed the [requirement] that a state regulatory agency must render a final decision on a matter before a taking claim can proceed.").

"A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." !! *Congregation Rabbinical Coll.*, 2021 WL 4392489, at *6 (quoting *S&R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008. While "the final-decision requirement 'is not mechanically applied,'" *Vill. Green*, 43 F.4th at 294 (quoting *Murphy*, 402 F.3d at 349), avoiding the finality requirement presents "a 'high standard' met only 'when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical,'" *Rabbi Israel Meyer Hacohen Rabbinical Seminary v. Town of Putnam Valley*, No. 21-CV-7050, 2022 WL 4357933, at *11 (S.D.N.Y. Sept. 20, 2022) (quoting *Sherman v. Town of Chester*, 752 F.3d 554, 563 (2d Cir. 2014)). Exceptions to the finality requirement include futility, i.e., "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied," *Vill. Green*, 43 F.4th at 294 (quoting *Murphy*, 402 F.3d at 349), or where "local authorities are manipulating 'a zoning process out of discriminatory animus to avoid a final decision,'" *Grand Medford Ests., LLC v. Town of Brookhaven*, No. 22-CV-7834, 2024 WL 185318, at *4 (E.D.N.Y. Jan. 17, 2024) (quoting *Vill. Green*, 43 F.4th at 294), *aff'd*, No. 24-402, 2024 WL 4440231 (2d Cir. Oct. 8, 2024); *see also Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 123 (2d Cir. 2014) ("[A] plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face or the manipulation of a zoning process out of discriminatory animus to avoid a final decision." (internal citations omitted)).

The Court finds that the futility exception does not apply here. Plaintiffs allege that Project approval has been delayed for five years and that the Village has "repeatedly moved the goalposts on Plaintiffs for five years." (Pl's Opp. 12; Am. Compl. ¶ 14.) Plaintiffs submitted the initial Project application in 2018. (Am. Compl. ¶¶ 6, 67.) In 2020, 61 EMSA and

15

Washingtonville settled pending litigation concerning the Property and Washingtonville agreed to "review the application for the Site Plan to a conclusion, diligently and in good faith." (Am. Compl., Ex. C at ECF 8–9.) Plaintiffs participated in 11 Planning Board and ZBA meetings between March 2021 and April 2023. (*See generally* Am. Compl.) Importantly, the Project changed over this time period, from a single building with fourteen units and one commercial tenant, (*id.* ¶¶ 67, 99), to two buildings with fourteen units and one commercial tenant each, (Am. Compl., Ex. D at ECF 2–3), to two buildings with twenty-eight units each and no commercial tenants, (Am. Compl., Ex. G at ECF 2).[2] Plaintiffs' decision to change the Project on more than one occasion accounts for some portion of the delay in securing Project approval, and so Plaintiffs "cannot impute the complete duration of the delay onto Defendants." *Cf. Rabbi Israel*, 2022 WL 4357933, at *11. "[W]hile there is no precise cut-off, cases in this Circuit have found that delays as long as eight years are insufficient to surmount the finality requirement." *Id.* at *12 (collecting cases). The delay here of five years is "not considerable enough to overcome the finality requirement on its own." *Id.* (finding that a delay of eight years was not enough to establish futility on its own and noting that the Second Circuit has held delays of ten and twenty years overcame the futility requirement).

Plaintiffs also argue that the denial of their hardship variance under the Second Moratorium and extensions of the same suggest that Defendants have dug their heels in,

---

[2] Plaintiffs claim that they sought to remove the commercial spaces and replace them with fourteen residential units each "after the Village strongly suggested Plaintiffs do so." (Am. Comp. ¶ 99.) This assertion is undermined by the remarks of a 61 EMSA engineer, who stated that 61 EMSA was "[a]sking for an all-residential use instead of a mixed use" because 61 EMSA "can not [sic] financially build a project that only has 14 units." (Am. Compl., Ex. H at ECF 2; *see also* Am. Compl., Ex. D at ECF 4 (indicating that 61 EMSA was also responsible for the change from one building to two when a 61 EMSA representative stated, "We are looking for the ability to have two buildings as opposed to one building.").)

indicating futility.  (Pl's Opp. 10–11.)  Plaintiffs point to the Second Circuit's decision in *Sherman v. Town of Chester*, where it held that the futility exception applied.  752 F.3d at 562–63.  But the Village has not, as in *Sherman*, enacted multiple new regulations over a short period, or issued a moratorium that applied only to Plaintiffs, or required Plaintiffs to pay thousands of dollars in fees before they could obtain a hearing.  *Id.* at 556–63.  Neither has the Village, as in *Lubavitch of Old Westbury, Inc. v. Incorporated Village of Old Westbury*, No. 08-CV-5081, 2021 WL 4472852 (E.D.N.Y. Sept. 30, 2021), denied multiple applications after rounds of negotiations that required Plaintiffs to go "back to the drawing board of several occasions."  *Id.* at *14.  And the Village has not, as in *Farmington-Girard, LLC v. Planning & Zoning Commission of City of Hartford*, No. 17-CV-1915, 2019 WL 935500 (D. Conn. Feb. 26, 2019), denied Plaintiffs' Second Moratorium variance application in a manner that indicates that it would reject any other variance applications from Plaintiffs for the same reason.  *See id.* at *8–9.  The circumstances that led to courts applying the futility exception are much more drawn out and egregious than those alleged here.

Rather, "even viewing the allegations in the light most favorable to Plaintiff[s], Defendants' alleged requirements appear to be well within the realm of 'give-and-take negotiations' expected from land-use approvals."  *Rabbi Israel*, 2022 WL 4357933, at *12 (citing *Sunrise Detox V*, 769 F.3d at 124).  The multiple Planning Board and ZBA hearings appear reasonable, especially in light of the changes in the Project plans, including whether two buildings were permitted on the Property, (Am. Compl. ¶¶ 87–94), and Plaintiff's decision to "trade the commercial designation and double the [residential] units," (Am. Compl., Ex. G at ECF 2).  The First and Second Moratorium have undoubtedly delayed final consideration of the Project application, but Plaintiffs have failed to meet the "high standard" of avoiding the finality

17

requirement by plausibly alleging that the Village's actions "are so unreasonable, duplicative, or unjust as to make the conduct farcical." *Isnady v. Village of Walden*, No. 21-CV-3730, 2022 WL 3587593, at *11 (S.D.N.Y. Aug. 19, 2022) (quoting *Sherman*, 752 F.3d at 563).

As for the discriminatory animus exception, the Court has found little caselaw that expands on this point. The Second Circuit has characterized this exception as arising from "some injury independent of the challenged land-use decision." *Sunrise Detox V*, 769 F.3d at 123. Here, the only alleged injury independent of the Project's delay and the denial of the Second Moratorium variance is the Village's preventing "development of housing that could be occupied by (and is desirable by) members of the Orthodox Jewish community." (Pl's Opp. 9; *see also* Am. Compl. ¶ 166 (characterizing the Second Moratorium as "prevent[ing] Plaintiffs[] from constructing the Project, and to exclude members of the Orthodox Jewish community from the Village").) As discussed above, Plaintiffs have not established third-party standing to bring claims on behalf of the Orthodox Jewish community writ large. *See* supra Section II.B.1. Plaintiffs have not established why the delay of the provision of residences that could house Orthodox Jewish families injures Plaintiffs, outside of Plaintiffs' financial interest in the success of the Project. The Court cannot square Plaintiffs' lack of third-party standing with a finding that Plaintiffs have been injured by the alleged lack of housing suitable for Orthodox Jews in the Village. To do so would fit a round peg in a square hole and contravene the general understanding that "[c]onstitutional ripeness is best thought of 'as a specific application of the actual injury aspect of Article III standing.'" *Jeannot v. New York State*, 762 F. Supp. 3d 217, 225 (E.D.N.Y. 2025) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013)), *appeal withdrawn sub nom. Jeannot v. McDonald*, No. 25-314, 2025 WL 2320485 (2d Cir. July 14, 2025).

The Court acknowledges that Plaintiffs may reasonably be frustrated by the delay they have experienced. But the factual allegations, as pled, do not plausibly suggest that the process has devolved into farce or warrant this Court's transformation into a zoning board of appeal. Accordingly, Plaintiffs' FHA, due process, and equal protection claims are dismissed as unripe. The ripeness of a Section 1985(3) conspiracy claim "depends upon the same constitutional violations undergirding the [Section] 1983 claim[]." *Lubavitch*, 2021 WL 4472852, at *12. Because the underlying Section 1983 is unripe, so is Plaintiffs' conspiracy claim. *Cf. id.* ("For the same reason the [Section] 1983 claim is ripe . . . the civil conspiracy claims are ripe as well."); *see also Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 410 n.9 (E.D.N.Y. 2008) (dismissing a Section 1985(3) claim as not ripe for review because it "relie[d] upon the same alleged constitutional violations found to be not ripe for purposes of Section 1983").

### III.  Conclusion

For the reasons set forth above, the Motion is granted. Plaintiffs have already amended their complaint after receiving a pre-motion letter from Defendants wherein Defendants previewed their intention to move for dismissal on the grounds identified above. (*See* Dkt. No. 32 (Defendants request a pre-motion conference for a motion to dismiss); Dkt., minute entry dated July 31, 2024 (pre-motion conference at which the Court granted leave for Plaintiffs to file an amended complaint); Dkt. No. 38 (Amended Complaint, filed July 17, 2024). Accordingly, the dismissal is with prejudice. *See Burton v. County of Westchester*, No. 21-CV-1475, 2022 WL 2340478, at *9 (S.D.N.Y. June 29, 2022) (dismissing with prejudice where plaintiff had amended his complaint after receiving a pre-motion letter); *Jones v. Cuomo*, 542 F. Supp. 3d 207, 226 (S.D.N.Y. 2021) (granting a motion to dismiss with prejudice because "[the] [p]laintiff has previously amended his complaint, but his [a]mended [c]omplaint fails to state a claim on

19

which relief can be granted. Moreover, [the] [p]laintiff was put on notice of the deficiencies in his [a]mended [c]omplaint by [the] [d]efendants' September 14, 2020 letter previewing their anticipated motion to dismiss, but instead opted to oppose the motion rather than to seek leave to amend" (citations omitted)); *see also Binn v. Bernstein*, No. 19-CV-6122, 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant [the] [p]laintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *cf. Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." (alteration, footnote, and quotation marks omitted)). The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 43 and close the case.

SO ORDERED.

Dated:   September 23, 2025
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge